Argued and submitted August 5, 2020; reversed and remanded July 13, 2022

STATE OF OREGON,
*Plaintiff-Respondent,*
*v.*
CURTIS CLINT WILLIAMS,
aka Clint Curtis Williams,
aka Curtis Clinton Williams,
*Defendant-Appellant.*

Multnomah County Circuit Court
17CR37474; A168472

514 P3d 501

Defendant appeals from a judgment of conviction for rape in the first degree, two counts of sodomy in the first degree, unlawful sexual penetration in the first degree, and three counts of sexual abuse in the first degree, asserting five assignments of error. In his first assignment of error, defendant contends that his consent to a buccal (oral) swab collection of his DNA was the product of the prior police violations of his rights to remain silent and to counsel under Article I, section 12, of the Oregon Constitution, and he argues that that DNA evidence should have been suppressed under *State v. Jarnagin*, 351 Or 703, 716, 277 P3d 535 (2012). Specifically, defendant asserts that the violations were flagrant, that he was continuously in custody and that there was no break in time or place between the violations and his consent, that the consent form that he signed did not remove the taint of the violations, and that the detectives used his unwarned statements to wear down his resistance and persuade him to consent to the buccal swabs. *Held*: Considering the first three *Jarnagin* factors, the Court of Appeals concluded that those factors all favored the conclusion that defendant's consent to the buccal swabs derived from the detectives' earlier violations of defendant's rights. Although the fourth and fifth *Jarnagin* factors presented more nuanced issues, ultimately, when applying all of the *Jarnagin* factors to the totality of the circumstances, the court concluded that the state did not meet its burden to show that defendant's decision to give his DNA was not the product of the detectives' earlier violation of defendant's rights. Therefore, the trial court erred when it denied defendant's motion to suppress the DNA evidence. That error was not harmless.

Reversed and remanded.

Kathleen M. Dailey, Judge.

Rond Chananudech, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Doug M. Petrina, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

SHORR, J.

Reversed and remanded.

Powers, J., dissenting.

**SHORR, J.**

Defendant appeals from a judgment of conviction for rape in the first degree (Count 1), two counts of sodomy in the first degree (Counts 2 and 3), unlawful sexual penetration in the first degree (Count 4), and three counts of sexual abuse in the first degree (Counts 6, 7, and 8), asserting five assignments of error. We reject without further discussion defendant's second assignment of error. In his first assignment of error, defendant contends that his consent to an oral or buccal swab collection of his DNA was the product of the police's prior violations of his rights to remain silent and to counsel under Article I, section 12, of the Oregon Constitution. We conclude that the trial court erred when it denied defendant's motion to suppress that DNA evidence, because, as we explain below, the state failed to meet its burden to demonstrate that defendant's consent attenuated the taint of the earlier *Miranda* violations. We also conclude that that error was not harmless. As a result, we reverse and remand the judgment. That disposition obviates the need to address defendant's remaining assignments of error.[1]

In reviewing the denial of defendant's motion to suppress, we review the trial court's decision for legal error and are bound by the trial court's express factual findings if evidence in the record supports them. *State v. Mast*, 301 Or App 809, 810, 459 P3d 938 (2020). We begin by reviewing the undisputed facts.

In 1986, defendant was convicted of first-degree rape. Defendant's DNA was collected and stored in the

---

[1] In his third assignment of error, defendant assigns error to an aspect of his sentencing. Because we reverse and remand the judgment on all counts, we need not reach that assignment of error. In his fourth and fifth assignments of error, defendant contends that the trial court plainly erred in instructing the jury that it could reach nonunanimous verdicts and in accepting a nonunanimous verdict on Count 1. The state concedes that the trial court erred in its instruction and in accepting a nonunanimous verdict on Count 1, but argues that the court's acceptance of unanimous verdicts on the other counts rendered any instructional error harmless as to the remaining counts. We accept the state's partial concession. We note, however, that, if this case is retried, the trial court will instruct the jury on unanimous verdicts consistently with the law that has developed since the initial trial. *See Ramos v. Louisiana*, 590 US ___, ___, 140 S Ct 1390, 1397, 206 L Ed 2d 583 (2020); *State v. Ulery*, 366 Or 500, 501, 464 P3d 1123 (2020) ("*Ramos* leaves no doubt that our state's acceptance of nonunanimous guilty verdicts must change * * *.").

Combined DNA Index System (CODIS). Further, because of that conviction, defendant is required to register as a sex offender on an annual basis.

In 2011, L, the complaining witness in this case, reported to police that she had been raped, and a sexual-assault nurse collected a sexual-assault kit. That 2011 kit was first tested in 2016 as part of a project to test a backlog of untested sexual-assault kits. Forensic testing showed that defendant's DNA stored in CODIS matched the DNA found on evidentiary swabs that had been taken from L's body and stored in the 2011 kit. In December 2016, Detective Christensen with the Portland Police Bureau reopened the 2011 case at issue here.

Christensen understood that the state needed to obtain an additional DNA sample from defendant to confirm that the DNA that the state had on file for defendant was in fact a match with defendant's DNA. Christensen also learned that defendant had failed to register as a sex offender for the prior two years. Christensen was aware that defendant's failure to register was a means by which to contact defendant.

In February 2017, police arrested defendant for failure to register as a sex offender and took him to the Central Precinct. The detectives on the case intended from the outset to obtain defendant's DNA through either defendant's voluntary consent or a search warrant. Christensen and another detective, Myers, took defendant to an interview room to question him. The detectives failed to give defendant any *Miranda* warnings. Despite that, the detectives questioned defendant for nine minutes. The interrogation, which was recorded, primarily focused on completing a sex offender registration form that required administrative information and defendant's signature. Defendant initially answered those questions relating to his administrative information, but after being asked if he knew his State Identification Number, defendant stated, "I'm not giving you no more information." Defendant then told the detectives, "I don't want to talk anymore." Christenson sought to clarify and asked, "you're saying you don't want to talk about anything?" Defendant responded, "No. I don't want to talk about

anything. Just lock me in the room over there. \* \* \* I don't want to talk about nothing."

        Rather than ceasing questioning and ending the interrogation at that point, Christensen told defendant that he would give him a break to rest, but that he "needed" to talk to defendant about a 2011 case:

    "[CHRISTENSEN]:   Do you want to take a little break for a little bit?

    "[DEFENDANT]:   I just want to lay down and go to sleep. I'm tired.

    "[CHRISTENSEN]:   Okay. Because there's another case I need to talk to you about, so I'll—

    "[DEFENDANT]:   What case?

    "[CHRISTENSEN]:   Well, you—you say you don't want to talk, so I'll give you a little break and let you—

    "[DEFENDANT]:   Well, I—I—

    "\* \* \* \* \*

    "[DEFENDANT]:   If—if I'm being charged, then you charge me. If not, I don't want to talk to you about nothing unless you give me an attorney. Am I being charged with a case? Am I being charged?

    "[CHRISTENSEN]:   You're not being charged with anything.

    "[DEFENDANT]:   Well, then you—

    "[CHRISTENSEN]:   Other than the fail[ure] to register as a sex offender \* \* \*—

    "\* \* \* \* \*

    "[CHRISTENSEN]:   You're being charged for those two things, but there's another case from 2011 that I need to talk to you about."

The interrogation continued as the detectives raised questions about the 2011 case but told defendant that he was not being charged in that case. Defendant again said, "I don't want to talk to you, period. No, I don't want to talk to you about nothing now, sir." The trial court found that

defendant "became verbally and physically agitated" during the interrogation.

The detectives then returned to the topic of the sex offender registration form, which defendant had not yet signed. The detectives explained that, regardless of whether he signed the registration form, he was being booked overnight because of his failure to register as a sex offender. After defendant eventually agreed to sign the form, Myers repeated the detectives' request that they talk to him about the 2011 case, stating that "if it was something consensual, that's one thing, or if you're just a horrible rapist *** then you probably shouldn't talk to us, but he's just trying to clear something up." Defendant denied any wrongdoing and said, "I don't even know what you're talking about. I don't want to talk to you about nothing. I already said that. If you gonna charge me, charge me, then get me a lawyer, period." As Christensen attempted to end the interrogation and shut off the recorder, Myers continued to talk to defendant about how Christensen would proceed with the 2011 investigation without defendant's input.

The detectives then took defendant to a holding cell that was just down the hallway and "very close" to the interview room. Although all of the discussions in the interview room were recorded, the four-minute discussion in the hallway and in the holding cell was not. Christensen testified regarding what occurred during that period. He testified that, as he walked defendant down the hallway towards the holding cell, he discussed the process for obtaining DNA swabs without defendant's consent and described the next steps in the process. When defendant was in the holding cell, Christensen explained to defendant that to follow up on the 2011 case he needed to get confirmatory DNA swabs from defendant, that he would seek a warrant to obtain those swabs, and that it would take four to five hours to get the warrant. Defendant said, "Now hold on. My DNA's already in the system," referring to DNA collected and stored following his prior conviction. Christensen explained that the crime lab needed confirmatory swabs, and defendant said that he would consent to a DNA sample but that he did not want to speak to anyone. Defendant said, "Well,

I'll do that. I just don't want to talk to anybody." Defendant and the detectives then returned to the interview room, four minutes after they had left it. The trial court found that defendant's "demeanor was no longer agitated after being brought back into the interview for the oral swabs."

Back in the interview room, Christensen explained to defendant that confirmatory swabs were needed because there was no one available to come into court to say that defendant's original DNA sample in CODIS actually came from defendant. Christensen, however, also suggested to defendant that the request for consent for defendant's DNA was nothing "new," and assured him twice that the process was "merely a formality." Along those lines, Christensen explained to defendant:

"[CHRISTENSEN]:   I know your DNA's already in the system.

"[DEFENDANT]:    Yeah.

"[CHRISTENSEN]:    But this is a—just a requirement for the lab.

"[DEFENDANT]:    It has nothing to do with—

"[CHRISTENSEN]:  I'm not going to ask you any questions.

"[DEFENDANT]:   —sexual predator DNA thing that come out or this is something new, the—

"[CHRISTENSEN]:   No.

"[DEFENDANT]:   It's extra?

"[CHRISTENSEN]:   No. This is the same. Your DNA is already in the system. This is confirmatory swabs just to show, yes, it is [you] that is in the system, and that's it. It's no other trickery. It's merely a formality.

"[DEFENDANT]:   It don't make no sense. It's just—

"[CHRISTENSEN]:   It doesn't.

"[DEFENDANT]:   If you already got it, why you want some more?

"[CHRISTENSEN]:   I will explain. Because when you went into jail before and someone swabbed you,—

"[DEFENDANT]: Uh-huh (affirmative response).

"[CHRISTENSEN]: —that person that swabbed you isn't available for court and isn't there to say these swabs came from [you]."

As noted, Christensen later reassured defendant again that the confirmatory swabs were "merely a formality."

Detectives provided defendant with a consent form, which provided, in part, "You may refuse to consent to a search and may demand that a search warrant be obtained prior to any search of the premises described below," and "I hereby authorize these officers to seize any article which they consider to be of value as evidence." The form did not advise defendant, who had still not received *Miranda* warnings, of defendant's right to counsel.

Christensen made two modifications to the form: first, changing the scope of consent from "premises" to "person," and second, changing the phrase "any article" to "oral swabs." Christensen also filled out the form to specify that defendant consented to four oral swabs. In reviewing the form, defendant adopted those modifications. As he reviewed the consent form, defendant explained, "I have no problem with that because I don't give a damn. If I fought it all the way, I'd still go—have to give them up down the road somewhere." Defendant signed the consent form and proceeded to self-administer four oral or buccal DNA swabs. That signature occurred within minutes of defendant's return to the interview room.

After collecting the buccal swabs, defendant again confirmed that he consented to the swabs rather than providing them pursuant to a warrant, saying, "Same thing, man. I ain't got nothing to hide. Even though I don't trust you, what can I do?" Christensen asked if defendant was under the influence of drugs or alcohol, and defendant said that he had consumed "a little bit of alcohol" but not enough to inebriate him.

In June 2017, defendant was indicted on one count of first-degree rape (Count 1), two counts of first-degree sodomy (Counts 2 and 3), two counts of first-degree unlawful sexual penetration (Counts 4 and 5), three counts of

first-degree sexual abuse (Counts 6, 7, and 8), and one count of coercion (Count 9) arising out of the 2011 incident. Before trial, defendant moved to suppress both his statements and the newly obtained DNA evidence, arguing that police obtained the evidence after violating his *Miranda* rights during the February 2017 interrogation and that his consent to give the buccal swabs was not voluntary. Although the state conceded that it would not seek to admit any portion of defendant's statements from that interrogation, the state asserted that defendant's consent to the buccal swabs was not the product of any *Miranda* violation. At the suppression hearing, the trial court heard testimony from Christensen as well as Detective Hahn, who had arrested defendant. The court also received into evidence a video recording of the first interrogation and an audio recording of the second interrogation and buccal swab collection. In an extensive letter opinion, the trial court made factual findings consistent with the foregoing recitation and denied defendant's motion to suppress, reasoning that the challenged DNA evidence did not derive from the earlier *Miranda* violations and that defendant voluntarily consented to the buccal swabs.

The case proceeded to a jury trial. At trial, among the evidence before the jury, the state introduced and relied upon DNA evidence derived from the challenged buccal swabs as well as evidence from defendant's 1980s DNA sample. No witness testified that they had direct knowledge that defendant had in fact provided the 1980s DNA sample. Rather, a witness from the Oregon State Police crime lab explained to the jury that the state used the four oral swabs collected by the Portland police from defendant in 2017 to confirm that they had a correct match between defendant's DNA and the 1980s DNA sample in CODIS. Ultimately, the jury acquitted defendant of one charge and found defendant guilty of first-degree rape, ORS 163.375, two counts of first-degree sodomy, ORS 163.405, one count of first-degree unlawful sexual penetration, ORS 163.411, and three counts of first-degree sexual abuse, ORS 163.427. This timely appeal followed.

On appeal, defendant first assigns error to the trial court's denial of his motion to suppress, arguing that the

detectives' *Miranda* violations were egregious and continuous such that they tainted his consent to provide the buccal swabs. The state remonstrates that the trial court did not err, because defendant's consent to the buccal swabs was not the product of the Article I, section 12, violation, and that, in any event, any error was harmless because the oral-swab evidence was cumulative and consistent with defendant's theory of the case.

Article I, section 12, provides that "[n]o person shall be * * * compelled in any criminal prosecution to testify against himself." To protect a person's right against compelled self-incrimination, law enforcement officers must, before questioning, give *Miranda* warnings to a person who is in custody or compelling circumstances. *State v. Jarnagin*, 351 Or 703, 713, 277 P3d 535 (2012). When an officer fails to give the requisite *Miranda* warnings, we suppress the statements that a suspect makes in direct response to unwarned questioning *and* any evidence, including physical evidence, that derives from or is a product of that constitutional violation. *State v. Vondehn*, 348 Or 462, 475-76, 236 P3d 691 (2010).

Here, there is no dispute that defendant was in custody and that his rights under Article I, section 12, were violated when detectives questioned him without providing *Miranda* warnings, and then repeatedly disregarded his invocations of his right to counsel and his unambiguous assertions of his right to remain silent. The issue before us is whether, under the totality of the circumstances, the DNA evidence obtained from the buccal swabs derived from those violations or whether defendant's consent attenuated the taint of those violations.

To determine whether evidence derived from or was the product of an earlier *Miranda* violation, we look at the totality of the circumstances. *Jarnagin*, 351 Or at 716. We apply the same analysis regardless of whether the challenged evidence is testimonial, or, as presented in this case, physical. *Vondehn*, 348 Or at 475-76. When assessing whether evidence derived from an earlier *Miranda* violation, we consider, among other factors,

> "the nature of the violation, the amount of time between the violation and any later statements, whether the suspect

> remained in custody before making any later statements, subsequent events that may have dissipated the taint of the earlier violation, and the use that the state has made of the unwarned statements."

*Jarnagin*, 351 Or at 716. The state bears the burden of production and persuasion to show that defendant's decision to give his DNA was not the product of the detective's earlier violation of defendant's right against self-incrimination and the derivative right to counsel under Article I, section 12. *See State v. Swan*, 363 Or 121, 133, 420 P3d 9 (2018).

Even when a *Miranda* violation has occurred, a defendant's voluntary consent can attenuate the prior violation if the consent was either "not affected by or was only tenuously connected to a prior illegality." *State v. Delong*, 357 Or 365, 378, 350 P3d 433 (2015); *see also State v. Unger*, 356 Or 59, 85-87, 333 P3d 1009 (2014) (analyzing when a defendant's voluntary consent can attenuate a prior violation of Article I, section 9, of the Oregon Constitution). To determine if a defendant's voluntary consent was "sufficient to break the causal chain," we consider a subset of the *Jarnagin* factors, as described in *Unger*: the nature of the violation, the character of the defendant's consent, and the causal connection between the violation and the defendant's consent. *Delong*, 357 Or at 378 & n 13 ("The factors that the court identified in *Unger* are a subset of the factors that the court identified in * * * *Jarnagin*.").

Defendant argues that all five *Jarnagin* factors indicate that his consent derived from the *Miranda* violations, and therefore, that the trial court erred in denying his motion to suppress. Defendant asserts that the violations were flagrant, that he was continuously in custody and that there was no break in time or place between the violations and his consent, that the consent form that he signed did not remove the taint of the violations, and that the detectives used his unwarned statements to wear down his resistance and persuade him to consent to the buccal swabs. As we discuss below, we agree with defendant on the first three factors, which all favor the conclusion that defendant's consent to the buccal swabs derived from the detectives' earlier violations of defendant's rights. The fourth and

fifth factors present more nuanced issues that we discuss below. Ultimately, when applying all of the *Jarnagin* factors to the totality of the circumstances here, we conclude that the state did not meet its burden to show that defendant's decision to give his DNA was *not* the product of the detectives' earlier violation of defendant's rights under Article I, section 12. *See Swan*, 363 Or at 133.

We begin with the nature of the violations and readily conclude that, contrary to the state's view, the violations were flagrant. As an initial matter, the state does not dispute that the detectives violated defendant's Article I, section 12, rights when they questioned him without giving him *Miranda* warnings and continued to question him even after he invoked his rights. Whether those violations were flagrant is relevant to the analysis because "unlawful and lengthy in-custody interrogation * * * is more likely to affect the defendant's decision to consent than more restrained behavior." *Unger*, 356 Or at 82.

Defendant was in full custody when the detectives failed to *Mirandize* him, and the detectives repeatedly continued to question defendant after he invoked his rights to silence and to an attorney—at least four times. In a case that was decided after this case was taken under advisement, the Oregon Supreme Court explained that a *Miranda* violation should be classified as nonflagrant only when the violation occurred in a situation where officers failed to recognize that the circumstances were sufficiently compelling to require *Miranda* warnings. *State v. Ward*, 367 Or 188, 201 n 9, 475 P3d 420 (2020) (citing *Swan*, 363 Or at 133). Here, by contrast, there was no question that defendant was in full custody, which clearly required *Miranda* warnings, or that detectives failed to give those warnings and further failed to stop questioning after defendant's multiple invocations of his constitutional rights. Accordingly, we conclude that the violations were flagrant.

Turning to the second *Jarnagin* factor, we conclude that the amount of time between the violation and defendant's consent to the buccal swabs—if any meaningful amount of time passed between the two events at all— also supports suppression. *See* 351 Or at 716. The initial

interrogation began without *Miranda* warnings, and, as the interrogation continued, the police ignored defendant's invocations of his Article I, section 12, rights to counsel and to remain silent multiple times. Christensen and defendant then moved into the hallway, where Christensen raised the subject of obtaining defendant's DNA sample. They spent four minutes in the hallway and in the holding cell, and, during that time, Christensen told defendant that he would be seeking a warrant to obtain defendant's DNA sample, at which time defendant verbally consented to provide a DNA sample. They then returned to the interview room where defendant signed a written consent.

That four-minute period was not a meaningful amount of time between the officers' unlawful conduct and defendant's consent. The very topic that was central to the officers' unlawful conduct—investigating defendant's purported involvement in the 2011 rape—never stopped after Christensen and defendant exited the interview room: In the hallway, before they even reached the holding cell, Christensen broached the topic of obtaining defendant's DNA, and that discussion continued when they went into the holding cell, where defendant first consented to the buccal swabs, at which time they returned to the interview room, where defendant reaffirmed his consent in writing. In other words, defendant's consent was obtained immediately after the officer's unlawful direct questioning had stopped. *See Unger*, 356 Or at 90 (concluding that the temporal proximity factor weighed in the defendant's favor where there was "no indication that any significant amount of time elapsed between the detectives' initial entry onto defendant's property and defendant's subsequent consent," and that "[b]oth of defendant's consents occurred during or shortly after the detectives' unlawful conduct").

As in *Swan*, the time between the prior illegality and defendant's decision to consent "blended into a continuum." 363 Or at 132 (internal quotation marks omitted). In *Swan*, "there was no break in time, place, or custody between the officer's repeated Article I, section 12, violation and defendant's decision" to consent to a physical breath test. *Id*. The circumstances are similar here. There was no material

temporal break, or change in circumstances, between the violations and defendant's consent. While there was a temporary change of scene, that change is not meaningful here, as defendant was merely moved from an interview room through a hallway to a holding cell that was "very close" by, and then, less than five minutes later, returned back down the hallway to the same interview room.

The third *Jarnagin* factor—whether the suspect remained in custody—also supports suppression. *See* 351 Or at 716. There is no dispute that defendant was continuously in custody; he was in custody while the *Miranda* violations occurred, when he initially told detectives that he would consent to a DNA sample, when he reviewed the consent form, and when he self-administered the buccal swabs.

We turn to the fourth *Jarnagin* factor, namely whether "subsequent events *** may have dissipated the taint of the earlier violation." 351 Or at 716. Because the significant subsequent event at issue here was defendant's consent to the buccal swabs, we also turn to the *Unger* factors that apply where the state contends that a defendant's consent broke the causal chain, namely the nature of the violation, which we have discussed, "the character of the consent," and "the causal relationship between" the violation and defendant's consent. *Unger*, 356 Or at 78. "[A] voluntary consent to search that is prompted by an officer's request can be sufficient to demonstrate that the consent is unrelated or only tenuously related to the prior illegal police conduct." *Id.* at 79. But "[v]oluntary consent, while important, is not dispositive," and the inquiry requires the court to undertake a fact-specific exploitation analysis based on the totality of circumstances. *Id.*

We acknowledge that defendant gave oral and written consent to provide his DNA evidence. Further, the trial court found that "defendant's decision to consent to the oral swabs was his own voluntary decision."[2] The court also found

_____

[2] We understand the trial court's finding "that defendant's decision to consent to the oral DNA swabs was his own voluntary decision," as well as similar findings in its opinion, to be findings of fact that defendant's consent was essentially a "volitional act." *See Delong*, 357 Or at 376 (noting distinction between a finding of a volitional act and a legal determination of voluntariness under *Miranda*). The trial court also later concluded that "the Court will not suppress

that defendant was informed of the choice of waiting for a warrant, that defendant indicated that he wanted to proceed with a consensual swab, that defendant was given a written consent form that he appeared to read, that the detective made changes to that form to confirm that the purpose of the consent was for DNA swabs only, and that the detectives "clearly explained what the oral DNA swabs were, and their purpose."[3] The court further found that defendant was no longer agitated when he returned to the interview room to sign the written consent. Christensen also accurately told defendant at one point that they needed a new DNA sample because the state did not have anyone to come into court to confirm his original DNA sample.

Those facts indicate defendant had some understanding of the nature and significance of his consent to the procedure. However, there are other facts that undercut the legal conclusion that the effect of the earlier *Miranda* violations had dissipated. Significantly, when defendant expressed confusion about why the detectives would need an additional DNA sample—noting that the state had already obtained his DNA—and further asked whether this related to something "new" or was "extra," Christensen twice downplayed the test as "merely a formality" and gave a misleading response. The detective responded:

> "This is the same. Your DNA is already in the system. This is confirmatory swabs just to show, yes, it is [you] that is in

---

the evidence under Article I, section 9, *** because the Court finds the consent was voluntary." It appears that latter reference, despite the use of the word "finds," may be a legal conclusion made following the application of a legal test. Regardless, we credit the trial court's factual findings of voluntariness, as there is evidence in the record to support those findings. *See Mast*, 301 Or App at 810. To the extent that the trial court was making a legal conclusion, we reach a different conclusion based on our legal-error standard of review. *See id.*

[3] To the extent that the trial court's finding was meant only to state that the police clearly explained the nature of DNA swabs and their purpose, that finding is supported by the evidence. To the extent that that finding was meant to suggest that the police clearly and completely explained *why* they needed a new sample of defendant's DNA, we conclude that that finding is not supported by the evidence. As we noted above, Christensen did at one point provide an explanation that the state needed defendant's DNA because there was no one available to come into court to testify that the original DNA sample in CODIS came from defendant. However, as we discuss further below, Christensen at the same time misled defendant by stating that the sample was not "new" and repeatedly downplayed it as just a "formality," which was not the case.

the system, and that's it. It's no other trickery. It's merely a formality."

That was only partially true, because while it related to defendant's earlier DNA sample, the detective's underlying goal throughout was to obtain new swabs to confirm defendant's identity as the suspect *in the new 2011 investigation*.

Defendant consented after he was initially confused by the need for and purpose of the buccal swabs and after he was misleadingly informed that the swabs were not "new" or "extra" and were "merely a formality." The earlier violation, which included the detectives repeatedly ignoring defendant's request to speak to an attorney, was not sufficiently dissipated when defendant's subsequent consent arose after his own expressed confusion about the swabs and the detective's misleading assurances regarding the same.

The state maintains that defendant fully volunteered his consent and argues that there is no causal connection between the violation and defendant's consent. The state contends that, as in *Delong*, this is not a case in which the unlawful interrogation "left little, if anything, of incriminating potential * * * unsaid." 357 Or at 380 (internal quotation marks omitted). In *Delong*, a deputy sheriff placed the defendant in custody after a traffic stop, and, without first advising the defendant of his *Miranda* rights, asked "if there was anything we should be concerned about." 357 Or at 367. The defendant responded "no" and then offered that the deputies could search the vehicle if they wanted. *Id.* The Supreme Court broke that response by the defendant into its two parts and noted that the second part had been "an invitation to the officers to search his car if they wanted to do so." *Id.* at 375. After concluding that the officer's unlawful conduct could "hardly be characterized as egregious," the court then concluded that the defendant's volunteered or volitionally made invitation was evidence of the character of the defendant's consent that attenuated the taint of the prior violation. *Id.* at 378-79; *see also State v. Rodriguez*, 317 Or 27, 41-42, 854 P2d 399 (1993) (concluding that the defendant's unsolicited offer to search his apartment attenuated the taint of a prior unlawful seizure where the officer asked the defendant if he had any guns or drugs and

the defendant responded, "No, go ahead and look."); *State v. Kennedy*, 290 Or 493, 504-06, 624 P2d 99 (1981) (concluding that the defendant's invitation, "Would you like to search my luggage," in response to an officer's assertion that the police had information that the defendant was carrying drugs, made the consent voluntary and therefore attenuated from any earlier illegal seizure).

Defendant's consent to the buccal swabs here was made volitionally. There were indications that defendant had some understanding of his consent. He received an explanation of the procedure that was, at times, correct. He gave both oral and written consent. The written form informed defendant that he could refuse consent and demand that the police obtain a search warrant. He also limited his consent to the buccal swabs and refused to offer other information.

However, the consent was also more tied to the prior constitutional violations than was the case in *Delong*. The police's post-violation conduct in obtaining defendant's consent occurred on the heels of the police ignoring defendant's repeated requests for an attorney and invocations of his right to remain silent, and included obtaining defendant's consent by downplaying and making misleading statements about the significance of that consent. The written form also did not inform defendant of his right to seek counsel regarding the buccal swabs. In sum, we conclude that the fourth *Jarnagin* factor relating to whether subsequent events may have dissipated the taint of the earlier violation, including the character of defendant's consent and the causal relationship between the earlier violation and that consent, slightly favors defendant.

We turn to the fifth *Jarnagin* factor, "the use that the state has made of the unwarned statements." 351 Or at 716. We conclude that this factor favors neither the state nor defendant. It is true, as the trial court found, that the police did not directly trade on defendant's un-*Mirandized* statements to obtain his consent. The police always had intended to obtain defendant's DNA either through his voluntary consent or by obtaining a warrant; after all, it was the primary reason that the police arrested defendant and brought

him to the station. *See Delong*, 357 Or at 380 (noting the lack of causation between the earlier violation and the later consent, based in part on the fact that police did not "trade on" the defendant's un-*Mirandized* statement to obtain the defendant's consent).

However, there were less direct ways in which the police did trade on the prior constitutional violation in obtaining defendant's consent. As noted, the police continuously ignored defendant's invocations, including his invocation of the right to counsel, and then traded on defendant's lack of counsel and his limited understanding of the purposes of the requested buccal swabs. We certainly cannot say that it was a foregone conclusion that defendant would have supplied his DNA sample without the earlier violations. *See Swan*, 363 Or at 132 (examining record to determine whether interrogation "left little, if anything of incriminating potential *** unsaid and effectively made defendant's decision" to provide evidence a "foregone conclusion" (internal quotation marks omitted)); *Rodriguez*, 317 Or at 40 ("Exploitation occurs when the police take advantage of the circumstances of their unlawful conduct to obtain the consent to search."). As a result, we conclude that the fifth *Jarnagin* factor favors neither side.

The Supreme Court has made clear that the mere fact that a defendant was in custody and gave consent to search after a *Miranda* violation does not, by itself, foreclose the possibility that an officer may conduct a lawful search pursuant to that consent. *Delong*, 357 Or at 383-84. Rather, the question depends on the facts of each case and "entails a consideration of the extent to which the nature and extent of the custodial questioning affected a suspect's decision to invite the search." *Id.* at 384. There is a "range of circumstances that can affect whether subsequently discovered evidence derives from the failure to give required *Miranda* warnings." *Id.* at 383. The facts here present a somewhat difficult analysis because they are not directly on point with prior case law. However, the state has the burden of proof and persuasion here. Considering all of the factors applied to the totality of the circumstances, we conclude that the state did not meet its burden to demonstrate that defendant's

consent was not the product of the unlawful violation and attenuated the taint of the earlier *Miranda* violations. As a result, we conclude that the trial court erred in concluding otherwise.

We also conclude that the error was not harmless. *See State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (stating that an error is harmless when we can say that there is "little likelihood that the particular error affected the verdict"). The state contends that any error was harmless because the evidence was only "confirmatory" oral-swab evidence that was only "collected in case there was a chain-of-custody dispute involving" defendant's prior DNA sample in CODIS. However, that argument ignores that the state did not prove that the original DNA sample in CODIS was defendant's except through the subsequent 2017 buccal swabs. The challenged evidence was not cumulative. The state proved defendant's identity through the newly acquired buccal swabs.

The state also contends that any error was harmless because the evidence was "insignificant and was consistent with defendant's theory of the case." Again, the evidence was not insignificant; it tied defendant directly to the complaining witness. The state sought it out to confirm defendant's DNA in CODIS. The state is correct that defendant argued in closing that there was evidence that any sexual activity that took place on the night in question "may have all been consensual activity." However, defendant never admitted that he had had sexual contact with the complaining witness. In closing argument, defense counsel went out of the way to continually refer to the "man" who had had sexual relations with the complaining witness, but never stipulated that defendant was that man. There was some other evidence connecting defendant to the complaining witness, primarily a note listing defendant's address. But we cannot say that the admission of the new DNA evidence that directly tied defendant to the complaining witness had little likelihood of affecting the verdict. *See Davis*, 336 Or at 32. The error was not harmless. As a result, we reverse and remand the judgment.

Reversed and remanded.

**POWERS, J.,** dissenting.

It is undisputed that a defendant's consent can attenuate the taint of an earlier *Miranda* violation. *See, e.g.*, *State v. Delong*, 357 Or 365, 378, 350 P3d 433 (2015) (explaining that a defendant's voluntary consent can attenuate a *Miranda* violation if the consent was either "not affected by or was only tenuously connected to a prior illegality"). The failure by law enforcement to give a person the required *Miranda* warnings does not necessarily prevent that person from making an independent decision to consent to a search. Generally stated, we look to whether a defendant's consent was "tainted" because it was "derived from" or was the "product of" the unlawful conduct by law enforcement. Given the trial court's extensive findings of fact in this case, including defendant's change of demeanor when he was brought back into the interview room to obtain the buccal swabs and defendant's volitional act of signing the modified consent form before self-administering those swabs, I would conclude that the trial court did not err in denying the motion to suppress. Accordingly, I respectfully dissent.

In this case, there is no question that the detectives failed to give defendant *Miranda* warnings and continued to question him in violation of his rights under Article I, section 12, of the Oregon Constitution. As the trial court's findings describe the circumstances, "During this time, Defendant became verbally and physically agitated and, although he initially refused to sign the sex offender registration [form], ultimately [he] did sign the registration." Further, there is no dispute about the trial court's findings of historical fact, which I describe in more detail below, leading up to defendant providing the buccal swabs. Because I generally agree with the majority opinion's detailed discussion of the factors described in *State v. Jarnagin*, 351 Or 703, 716, 227 P3d 535 (2012), and *State v. Unger*, 356 Or 59, 79-80, 333 P3d 1009 (2014) (analyzing when, in an Article I, section 9, context, a defendant's voluntary consent can attenuate a prior illegality), I do not repeat that analysis here. I further agree that many of those factors lean in defendant's favor. Those factors, of course, do not create a simple arithmetic

problem; rather, we are assessing the totality of the circumstances to determine whether the consent to provide the DNA evidence in this case was derived from or was the product of the earlier *Miranda* violations. *See Delong*, 357 Or at 373 (observing that, "[w]hen no belated *Miranda* warnings have been given, the question [of] whether the taint flowing from a *Miranda* violation has been attenuated will vary depending on the totality of the circumstances"); *Jarnagin*, 351 Or at 716 (explaining that, in evaluating attenuation, the court considers, among other factors, "subsequent events that may have dissipated the taint of the earlier violation"). As explained below, the totality of the circumstances leads me to conclude that the state carried its burden of production and persuasion to demonstrate that defendant's decision to provide the DNA samples was not the product of the investigators' earlier violations of defendant's right against self-incrimination and the derivative right to counsel.

In my view, the trial court made important findings of historical fact about the circumstances leading up to defendant's volitional act of providing the buccal swabs that the majority opinion too readily discounts. We are bound by the trial court's findings of historical fact where there is constitutionally sufficient evidence to support them. *State v. Maciel-Figueroa*, 361 Or 163, 165-66, 389 P3d 1121 (2017) (so stating). We will presume that the court found facts consistent with its ultimate conclusion, but we will not presume an implicit finding where the record does not support it or where the record shows that such a finding was not part of the trial court's chain of reasoning forming the basis of its ultimate legal conclusion. *State v. Gatto*, 304 Or App 210, 212, 466 P3d 981 (2020).

First, defendant's demeanor changed from initially being "verbally and physically agitated" during the first interview. The trial court contrasted defendant's initial demeanor with a finding of historical fact that his "demeanor was no longer agitated" when he was brought back into the interview room to self-administer the buccal swabs (or "oral swabs" to use the trial court's terminology). That demeanor change—when combined with a temporal and spatial change from leaving the interview room and coming

back to the room four minutes later—supports a conclusion that defendant's consent was not the product of the earlier *Miranda* violations.

Second, the trial court's order denying defendant's motion to suppress provides, in part:

> "Finally, after one final request for a lawyer, the detectives took Defendant back to a holding cell and the recording ceased. The uncontroverted testimony by Detective Christensen was that in the following four minutes, which was not recorded, the detective notified Defendant that he would be seeking a search warrant to obtain DNA swabs. Defendant then told Detective Christensen that his DNA was already in the system and although he would allow the swabs, he did not want to talk. Defendant was then returned to the interview room where the detectives and Defendant had a recorded but not videotaped conversation about the purpose of the DNA swabs. Defendant ultimately signed a consent form for oral DNA swabs."

Defendant does not challenge those findings on appeal, and the majority opinion appears to accept those findings. The majority opinion, however, then goes on to conclude that Christensen "misled defendant by stating that the sample was not 'new' and repeatedly downplayed it as just a 'formality,' which was not the case." 320 Or App at 719 n 3. That conclusion by the majority opinion appears to run directly contrary to the trial court's later findings, when it explained that defendant

> "was given a written consent form to review, acknowledged he could read and write, appeared to read aloud from the consent form, and adopted Detective Christensen's alteration of the consent form changing the term 'any article' to 'oral swabs.' The detectives clearly explained what the oral DNA swabs were, and their purpose. Defendant also acknowledged having given oral swabs before, and his statements reflect an understanding of their purpose: 'I understand the procedure when you *** they take; they run it through the machine to see if they get any hits.'"

The trial court's finding that the detectives "clearly explained what the oral DNA swabs were, and their purpose," which defendant also does not challenge on appeal, is supported by Christensen's uncontroverted testimony.

More importantly, the trial court's findings highlight that defendant was provided with a consent form that explained that he could refuse to consent to a search and that he could demand that a search warrant be obtained prior to any search. That standardized consent form was modified by Christensen to account for the specific type of search, *viz.*, a search of his "person" instead of "premises," and further modified to provide consent for a search that involved four buccal swabs.

Third and finally, the trial court also found that during the second interview that the detectives did not question defendant. The trial court explained, "In fact, when Defendant brought up the 2011 rape case several times during the swab process, the detectives reminded Defendant that he had invoked his rights to silence and counsel and that they could not ask any questions about that."

In short, under the totality of the circumstances, defendant exhibited a significant demeanor change and had the opportunity to review and sign a consent form that was modified for the specific type of DNA search before providing his consent. Although it is undisputed that the detectives violated defendant's right against self-incrimination and the derivative right to counsel, the state has, in my view, proved that defendant's subsequent decision to provide his consent to the DNA swabs was not a product of the earlier violations. Given the trial court's findings of historical fact, which defendant does not challenge on appeal, I would affirm the trial court's denial of the motion to suppress. Accordingly, I respectfully dissent.