Argued and submitted February 8, reversed and remanded May 11, reconsideration denied July 22, petition for review denied August 16, 1983 (295 Or 541)

## STATE OF OREGON,
*Respondent,*

*v.*

## JOSEPH ARTHUR GUAYANTE,
*Appellant.*

(10-81-11037; CA A24593)

663 P2d 784

Marilyn C. McManus, Deputy Public Defender, Salem, argued the cause for appellant. With her on the brief was Gary D. Babcock, Public Defender, Salem.

Robert E. Barton, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

Before Richardson, Presiding Judge, and Van Hoomissen and Newman, Judges.

NEWMAN, J.

## NEWMAN, J.

Defendant was convicted of robbery in the first degree. ORS 164.395.[1] He argues that the trial court erred in denying his motion to suppress and in refusing to admit certain evidence which he offered at the suppression hearing. We reverse.

Whitsell, an acquaintance of defendant, contacted the Springfield police in the early morning of December 4, 1981, and reported that defendant had assaulted and robbed Wolfe, an elderly man confined to a wheelchair. Whitsell, defendant and Wolfe had been drinking together in Wolfe's apartment the evening of December 3. During that evening Whitsell and defendant visited Wolfe's apartment three times. Whitsell and defendant also drank between their visits to the apartment. Defendant testified that he had also been drinking earlier in the day and had taken seven "hits" of LSD. After leaving Wolfe's apartment the third time, defendant told Whitsell he was going back to rob Wolfe. A few hours later defendant reappeared at Whitsell's house and told him that he had struck Wolfe and had stolen his food stamps and money. Defendant fell asleep on Whitsell's couch.

Whitsell contacted Detective Bond of the Springfield Police Department. Bond had known Whitsell for "quite some time" and knew that he was "mentally unstable." He went over Whitsell's story several times with him in "chronological order" and the details proved to be consistent. Whitsell's story also was corroborated by the report received from the crime scene. Investigator Smith of the Springfield Police Department considered Whitsell's actions in contacting the police as those of a good citizen and "had no reason to believe he was lying." However, there was also testimony that the police suspected Whitsell and defendant could have been accomplices.

Bond and Smith went with Whitsell to his home at approximately 6:30 a.m. on December 4. Neither officer was in uniform. Defendant was still asleep on the couch. Smith awakened defendant and asked him to stand up. He and Bond identified themselves as police officers. Smith told defendant that they were there because of the attack on Wolfe and "just

---

[1] The trial was held on stipulated facts.

openly confronted him with the responsibility of that crime."
Defendant denied responsibility. He admitted that he had
been at Wolfe's apartment but said that he had not hit the old
man or robbed him. Smith stepped around, looked behind the
couch and observed a stack of food stamps and money on the
floor. Smith testified that he told defendant, "Look, we already
know you did it. Here is the stuff you took from him." Defen-
dant said, "Yes, I did it." Bond then stopped defendant and
gave him *Miranda* warnings. Defendant stated that he under-
stood his rights.

Defendant was arrested and taken by Smith in a
police car to the Springfield Police Department. In the police
car on the way to the police department he made further
incriminating statements, including the fact that he had also
taken a bottle of vodka from Wolfe and that it was at Whit-
sell's house.[2] At the police department at about 7 a.m., defen-
dant gave a tape recorded interview to Bond and Smith in
which he confessed to the robbery.

Defendant moved to suppress the confession and
admissions made on December 4, 1981. He argued that the
admission made before his arrest was inadmissible because it
was made during a custodial interrogation prior to advise of his
*Miranda* rights. He also argued that the subsequent
inculpatory statements and the tape-recorded confession were
inadmissible because (1) they were tainted by the prior illegal
confession and (2) defendant was too intoxicated knowingly to
waive his *Miranda* rights.

The trial court denied defendant's motion and made
the following findings:

"My personal belief is that the Defendant was not in a
custodial status when he was asked the question or shown the
lawfully found proceeds of the crime and said, 'I did it.'

"I recognize, though, that that could be subject to some-
body else's idea that that may be custodial or is custodial. If it
was custodial then the statement was made before Miranda
rights were given to the Defendant. If it is custodial and the

---

[2] Apparently Bond retrieved the vodka bottle from Whitsell's residence. Defen-
dant's motion to suppress and the judge's finding do not cover the physical evidence of
the bottle itself. The bottle was not offered or received at the stipulated facts trial.
Defendant argues for the first time on appeal that the bottle should be suppressed. We
do not decide whether the bottle, if offered, is admissible.

statement was made without a prior statement of Miranda rights by the police officers, it's the most technical violation of Miranda because it was not an involuntary statement, it was not a coerced statement, it was not the result of any improper police tactics, and it was not the result of any Fourth Amendment violation. It was a pure when in custody give them their rights even if they already know what they are rule. And I guess because it's hard to analyze cases in particular, we're starting to get knee jerk rules. Even though the Defendant has been given his rights multiple times before, it could be viewed that he needed to get the rights again."

The trial court's findings continued:

"So if he's in custody and if the technical Miranda prohibition would exclude the first 'I did it,' I specifically make the finding that the State has overdone their tremendous burden of convincing me that the Defendant's second statement was not as a result of the first one but rather was a result of his free will. His own testimony indicated that. The tape recording indicated that. His method of speaking during the course of the tape recording as compared to his method of speaking on the stand indicated that.

"I really have no hesitancy at all in making the further finding that the tape-recorded statement was not tainted at all by the 'I did it.' "

The court also found that defendant was not too intoxicated knowingly to waive his *Miranda* rights.

On appeal, defendant again asserts that the first confession was obtained in violation of his *Miranda* rights; that the second confession was irreparably tainted by the initial illegality; and that defendant was too intoxicated to waive his rights. Because we agree with defendant on his first two arguments and reverse on that basis, we need not address the last issue.[3]

While we are bound by the historical facts found by the trial court when they are supported by the evidence, this

---

[3] Defendant also assigns as error the court's refusal to admit a security release form upon which was written "defendant too high to give accurate information." Defendant argues that the report should have been admitted at the suppression hearing as an exception to the hearsay rule as a past recollection recorded, public record or business record. OEC 803(5), (6) and (8). Given our conclusion that the first admission was illegally obtained and that the subsequent statements and confession were tainted by the first, we do not decide the question of the admissibility of the security release form.

court must determine whether defendant was in custody and subject to interrogation when he said, "I did it," and whether his subsequent statements, including his tape-recorded confession, are tainted by any preceding illegality. *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968).

We hold that at the time defendant admitted, "I did it," he was in custody. Bond testified that before contacting defendant, he felt that he had probable cause to arrest him for robbery and assault and "anticipated him admitting responsibility." Bond further testified that he had decided that he was "probably" going to arrest defendant. Smith acknowledged that, when he "openly confronted [defendant] with the responsibility of the crime," he was not free to leave. The state concedes that when Smith then saw the money and food stamps, he concluded that defendant was responsible for the robbery and assault. At that time defendant was not free to leave the scene, was significantly deprived of his freedom of action and was "in custody." *State v. Roberti,* 293 Or 59, 644 P2d 1104, 293 Or 236, 646 P2d 1341 (1982); *State v. White,* 59 Or App 61, 650 P2d 184 (1982); *State v. Wells,* 58 Or App 617, 650 P2d 117 (1982); *State v. Paz,* 31 Or App 851, 572 P2d 1036 (1977), *rev den* 282 Or 189 (1978). Smith then, without giving defendant *Miranda* warnings, showed defendant the evidence, stating, "Look, we already know you did it. Here is the stuff you took from him." Defendant admitted, "I did it."

The state also argues that defendant was not being subjected to "interrogation" when Smith said, "Look, we already know you did it. Here is the stuff you took from him." We disagree. Smith's statement to defendant was intended to elicit the very response it received: "I did it." In *Rhode Island v. Innis,* 446 US 291, 301-02, 100 S Ct 1682, 64 L Ed 2d 297 (1980), the Supreme Court defined "interrogation" under *Miranda* as referring

" * * * not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive

police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (Footnotes omitted; emphasis in original.)

Defendant's statement, "I did it," was the product of custodial interrogation made before the advice of his *Miranda* rights and was not admissible.

Our next inquiry is whether there was a sufficient break in the stream of events between defendant's inadmissible pre-*Miranda* statement and the statements and tape-recorded confession made subsequently and after arrest so that "the coercive effects of the earlier unlawful conduct had been effectively removed." *State v. Mendacino,* 288 Or 231, 603 P2d 1376 (1979); *Wong Sun v. United States,* 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963). The state argues that because the arresting officers were not in uniform and did not display firearms or "threaten" defendant, the subsequent advice of *Miranda* rights was sufficient effectively to "remove * * * the circumstances which rendered the prior statement inadmissible."

In *State v. Elstad,* 61 Or App 673, 658 P2d 552 (1983), the defendant was questioned in his living room by police officers Burke and McAllister about a robbery. He was not told that he was under arrest or given *Miranda* warnings. When told by the police that he was suspected of being involved, defendant stated, "Yes, I was there." He was arrested and taken to the police station in a police car by other officers. Forty-five minutes to an hour later Burke and McAllister arrived at the police station. The defendant was given *Miranda* warnings and gave a written confession to Burke and McAllister, who were the only other persons present. The state did not dispute the inadmissibility of the statement elicited from the defendant at his home but argued that the subsequent confession was not tainted by the initial illegality. As in the present case, the state also argued that the absence of actual compulsion should be a factor in determining if there was a

sufficient break in the stream of events to insulate a defendant psychologically from the effect of the coercive circumstances. In response we stated:

> " * * * The state's analysis denigrates the importance of *Miranda* * * * in which the court held that the warnings were mandatory in order to protect Fifth Amendment rights against 'the compulsion inherent in custodial surroundings.' 384 US at 458. Regardless of the absence of actual compulsion, the coercive impact of the unconstitutionally obtained statement remains, because in a defendant's mind it has sealed his fate. It is this impact that must be dissipated in order to make a subsequent confession admissible. In determining whether it has been dissipated, lapse of time and change of place from the original surroundings are the most important considerations. * * *" 61 Or App at 677.

*See also State v. Mendacino, supra.*

In *State v. Hibdon,* 57 Or App 509, 645 P2d 580 (1982), two policemen with a warrant for the defendant's arrest for burglaries found him in his girlfriend's apartment and arrested him. Before giving him *Miranda* warnings, one of the officers asked if a backpack in the room was his and whether some coins and two tequila bottles sitting on a chest of drawers were from the burglaries. The defendant answered affirmatively to both questions. The backpack and the coins were seized, the defendant was placed in the patrol car, the officer read him the *Miranda* warnings and transported him to the police station. After being given *Miranda* warnings a second time, the defendant confessed to the burglaries in a taped statement given to the officer.

This court suppressed the confession, holding that the police elicited an incriminating admission from the defendant in response to the question whether money in the tequila bottles came from the burglary. We stated:

> " * * * Defendant's response, that some of it had[,] 'let the cat out of the bag.' By his statement, defendant admitted to theft by possession of stolen property, if not to the burglary itself. It was not until after police had this admission that they read to defendant his *Miranda* rights. His full taped confession to the burglaries was taken less than one hour later at the police station. The taint of the police misconduct in questioning defendant before administering the *Miranda* warnings was not removed by the brief span of time and the change of his

location from Ms. Nobel's apartment to the police station, notwithstanding the fact that he had received *Miranda* warnings in the meantime. *United States v. Bayer,* 331 US 532, 540-41, 67 S Ct 1394, 91 L Ed 1654 (1947); *State v. Mendacino,* 288 Or 231, 603 P2d 1376 (1979). Defendant's confession should have been suppressed." 57 Or App at 512.

In the present case, defendant's tape-recorded confession was made at the police department to Bond and Smith approximately 30 minutes after they awakened him at Whitsell's apartment and obtained his statement, "I did it." Defendant also made incriminating statements to Smith in the police car on the way to the police department. Although the location of the tape-recorded confession was at the police station, the two interrogating officers remained the same. The taint of the police misconduct in interrogating defendant before administering *Miranda* warnings in Whitsell's apartment was not removed by the brief span of time and the change of his location from Whitsell's apartment to the police car and then to the police department. It was error to deny defendant's motion to suppress his statements and tape-recorded confession.

Reversed and remanded for a new trial.