No. 650 December 13, 2023 479

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CONOR AUSTIN GOLD,
*Defendant-Appellant.*

Benton County Circuit Court
20CR22569; A177144

Locke A. Williams, Judge.

Argued and submitted August 30, 2023.

Marc D. Brown, Deputy Defender, argued the cause for appellant and filed the brief for appellant. Also on the brief was Ernest Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Christopher A. Perdue, Assistant Attorney General, argued the cause and filed the brief for respondent. Also on the brief were Ellen Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Tookey, Presiding Judge, and Egan, Judge, and Kamins, Judge.

TOOKEY, P. J.

Reversed and remanded.

Kamins, J., dissenting.

**TOOKEY, P. J.**

Defendant appeals a judgment of conviction for seven counts of first-degree encouraging child sexual abuse, ORS 163.684, and one count of encouraging sexual assault of an animal, ORS 167.341. On appeal, defendant assigns error to the trial court's denial of his motion to suppress. Specifically, among other points, defendant contends that law enforcement violated his rights under Article I, section 12, of the Oregon Constitution when officers interrogated defendant after he invoked his right to counsel.[1] For the reasons below, we reverse defendant's convictions and remand for further proceedings.

## BACKGROUND

"We review the denial of a motion to suppress for legal error and are bound by the trial court's findings of fact if evidence in the record supports them." *State v. Gillispie*, 295 Or App 702, 704, 436 P3d 65, *rev den*, 365 Or 194 (2019). We state the following facts in accordance with that standard.

In January 2016, defendant was convicted of two counts of first-degree encouraging child sexual abuse, ORS 163.684, and seven counts of second-degree encouraging child sexual abuse, ORS 163.686. Defendant's convictions were the result of evidence discovered by Detective Dale and others when executing a search warrant on defendant's mother's home. Defendant resided at his mother's home at all times relevant to defendant's 2016 convictions and to the convictions defendant now appeals. As part of his probation for the 2016 convictions, defendant was prohibited from possessing any device with access to the internet without the written approval of his probation officer. He was also required to consent to search upon his probation officer's reasonable belief that evidence of a probation violation would be found.

In October 2016, during a polygraph examination, defendant admitted to accessing child sexual abuse materials.

---

[1] Article I, section 12, provides that, "[n]o person shall be *** compelled in any criminal prosecution to testify against himself." The Article I, section 12, "right against self-incrimination includes a derivative right to counsel during custodial interrogation." *State v. Scott*, 343 Or 195, 200, 166 P3d 528 (2007).

That information was sent to Dale who, in November 2016, served a second warrant on defendant's mother's home.

In November 2019, defendant's probation officer, Johnson, during a search of defendant's mother's home, seized an X-Box that defendant possessed and had been using to access the internet. Johnson gave the X-Box to Dale to search. Subsequently, Dale located multiple email accounts associated with the X-Box.

In January 2020, defendant gave consent for law enforcement to monitor the email accounts Dale had discovered. From his review of those email accounts, Dale also discovered that, within minutes of Johnson leaving defendant's mother's house with the seized X-Box in November 2019, a new device—a Kindle Fire—had been associated with defendant's Comcast account. Dale began an investigation "related to the viewing and accessing of child sexual abuse material through the X-Box." Dale also informed Johnson about the Kindle and started preparing a third search warrant for defendant's mother's home.

In March 2020, as a result of monitoring defendant's email accounts, Dale received an email notification from Comcast that defendant had activated a one-hour on demand-internet pass. Dale immediately notified Johnson that defendant had activated the internet pass.

Johnson and another probation officer, Dede, then went to defendant's mother's house try to locate the Kindle Fire that defendant was using to access the internet, "knowing that [defendant had] only gotten a one-hour pass," which left a just narrow window for Johnson and Dede to "go out there and pretty much confirm that yes, he has this device," which Johnson planned to seize. Johnson also arranged for Dale to meet her at defendant's mother's house.

When Johnson arrived at defendant's mother's house, defendant's mother let Johnson and Dede in and led them upstairs to defendant's room. Defendant's door was closed. Defendant's mother knocked on the door and announced, "Your PO is here." Defendant opened the door. Johnson told defendant that she was there to do a residence check, that "based upon information that we had received

from \*\*\* email" she "believed that he had been accessing the internet through a device," and asked for consent to search his room for a device. Defendant said that he "wasn't sure" if he wanted to consent to a search. By that point, Dale had arrived, and the events that followed, as summarized below, were recorded on Dale's body camera.

Johnson said to defendant, "so you don't want to consent to a search, do you want to tell me where the device is?" In response, defendant disclosed to Johnson that he had a PlayStation in the closet, and Johnson responded, "OK, a different one than that?" Johnson then asked to look in the closet at the PlayStation and defendant consented to that request.

Johnson then said to defendant, "So are their other devices? Where? Come on." Johnson went on to say to defendant, "So this one[, the PlayStation,] is different than you've had before, alright? So other devices." And then Johnson asked defendant about the power cords for the PlayStation.

Defendant's mother, who had been present for Johnson's entire exchange with defendant, then asked whether this was about "adding a new device," and Johnson responded that this was "more specifically about [defendant's] use." After a brief exchange with defendant's mother, Johnson asked defendant's mother whether defendant had spoken to her about the X-Box that Johnson had seized that defendant had been using to access the internet, and defendant's mother indicated that defendant had not. Johnson testified that she asked defendant's mother about the X-Box because she had twice previously spoken with defendant about "sharing that information with his mom and discussing it" with her for reasons of "safety, protection," and "accountability." Johnson then said to defendant, "so you still haven't done that?"

Johnson then asked defendant again, "[Defendant,] do you want to tell me where your other device is?" And followed that statement by saying to defendant:

> "Well, you know when you think of it if you're really wanting to change behaviors there's that honesty part that comes with it. And obviously it's always a choice, \*\*\* but if you are really wanting something different and to change those that's part of it."

Defendant said he did not think he had enough information regarding consenting to a search, and Johnson read defendant information about his obligation to consent to searches by his probation officer before telling him, "So like I said, it's up to you, you're the one that has that ability to give consent."

Defendant's mother then asked whether defendant would be taken into custody if he did not consent to a search, and Johnson told her that she did not know, and that it depends on the "totality of the situation." Defendant's mother told Johnson that she is "never comfortable with searches of her house," and defendant then stated that he did not consent to a search.

Defendant's mother asked Johnson if "there is something specific that you are looking for that he can hand over to you?" And Johnson said, "yes, *** specifically an electronic device that accesses the internet. Most likely a tablet or phone." After that, defendant pointed out that he had disclosed the PlayStation, and Johnson said, "[defendant,] that's why I asked you if you wanted to tell me where the other device is." Defendant reiterated that he did not consent to a search.

Johnson, Dede, Dale, defendant, and defendant's mother then went downstairs. Johnson spoke with Dale outside the residence and told him that she was going to take defendant into custody for a probation violation based on his refusal to consent to a search, but that she needed someone who was able to transport him. Dale arranged for another individual from the sheriff's office, Lieutenant Duffitt, to come to the residence to transport defendant. Dale and Johnson then returned to the house. Johnson explained to defendant that he was under arrest for violating the conditions of his supervision, but that he would not need to be handcuffed while they were waiting for a car to transport him as long as he consented to a patdown. He consented.

Once Duffitt arrived approximately 13 minutes later, Dale read defendant his *Miranda* rights, handcuffed him, and defendant's mother told defendant to "ask for a lawyer." Defendant said, "I'm requesting a lawyer," and his

mother said, "No, I mean, if you're going to be questioned." Defendant responded, "All right then. I hear you." Dale then told defendant and his mother, "I have no intentions of questioning him right now, but as soon as we're done here I'm going to kind of fill everybody in on what's going on."

At that point, with defendant sitting on the bottom of the stairs, handcuffed, Dale said to defendant and his mother that he was "just going to lay out" all the information he has "because at this point there is no need to keep anything secret." Dale "mostly directed" the statements that followed, which presented some of the evidence law enforcement had collected regarding defendant, toward defendant's mother, who was sitting on a couch inside a room across from the stairs.[2] But defendant was seated only a few feet from Dale and could hear Dale. During the suppression hearing, Dale testified that everyone at that point was "kind of in a circle," although defendant's mother was "in a different room."

The following exchange then occurred:

"DALE: [Defendant's] email accounts were signed over [to us]. He consented to giving us access and controlling three email accounts back in January. Inside of one of those three email accounts there are receipts dating back to 2017. Those receipts are coming from Comcast. They are receipts for paying for on-demand Wi-Fi. Comcast has cable modems in millions of homes and businesses across the United States. There is a home in your neighborhood

---

[2] We note that, during the suppression hearing, Dale agreed with defendant's characterization that he presented the evidence that the state had against defendant after defendant had asked to speak with an attorney:

"Q. When you got there you were aware that [defendant] had requested to speak with an attorney?

"[DALE]. Yes.

"Q. And you went on to present the evidence that you had against [defendant]; correct?

"[DALE]. Yes."

Dale testified as follows regarding his intention when "fill[ing] everybody in":

"[DALE]. At that point I wanted to make sure that [defendant's] mother, who he's living with, was fully aware of the behavior that he was engaging in which would have been happening under her nose, I would assume without her knowing, so that she could be fully understanding of what his actions have been and to be fully aware of our processes and what needed to happen from here on out."

within range of this house that is broadcasting one of those publicly available Wi-Fi hotspots. Individuals can use a device to sign on and use a credit card. It could be a prepaid card that you buy from the store. And you can pay for a one-hour block of time, a two-hour block of time, a one-day pass, a one-week pass, or a one-month pass for various amounts. And then once a month you get a one-hour pass for free. So there are receipts dating back to 2017. I've analyzed the receipts for 2019. And in comparison to the number of hours there are in the year of 2019, he had paid for enough Wi-Fi passes to cover 49.37% of the year. So for half of the year he has access to the internet.

"We also know that within minutes of [Officer Johnson] leaving here in November [2019] that same email account got an email from Comcast that says 'Is this Amazon Fire tablet that you just added to your account—is this you? Is this an authorized access to your on-demand account?' So we know that [defendant] had activated [an] Amazon tablet on his Wi-Fi account.

"So we know that he's been paying for Wi-Fi passes. His last one that he paid for expired, I think, on Monday night around 6 pm. It was a one-week pass. And this morning probably about an hour and ten minutes ago he activated a one-hour free pass to access the internet that would have now expired about 10 or 15 minutes ago. So we do know that accesses to those Wi-Fi spots have been happening from an account that he gave us consent to use, that he has a password to use, and that has other emails in there that are indicative of him using because he is mentioning to us giving consent in the past for usernames that are all associated with some of these other accounts that are also in there. And then we know from data from Comcast that those access times—they're all hitting one of those Wi-Fi hotspots here in your cul-de-sac.

"So we intend to continue to write a search warrant to search your home for any devices that are capable of accessing the internet to include—

"DEFENDANT'S MOTHER:   My entire home?

"DALE:   Yes. To include—

"DUFFIT:   We came here looking for the consent and cooperation rather than writing a search warrant, hitting your door down, coming in, spending a—hours and hours

of time to look for these devices and this particular device out of respect for you and out of respect for this household. We came looking for consent, hoping that somebody would understand that, especially somebody who's been down this road before, right? So, I'll let you continue with what our road is for the search warrant. We can still provide you options. It doesn't necessarily have to happen. We can give you options, okay?

"DEFENDANT'S MOTHER:   But you're going to start with his room and not tear apart my house?

"DALE:   Just to back up a little bit. I was already in the process of writing the search warrant. It is not complete at this time. I have not applied for that search warrant to a judge. My intention is to complete that process today and go in front of a judge and apply to receive that search warrant. But my intention would be that that search warrant would cover the entirety of this household because we don't know where he would be hiding such a device. I mean, the search warrant—regardless of where we start with the search warrant, the search warrant is going to authorize a search of everywhere, because we don't know where he could be hiding something. So, again, our intention was now that we knew that he had come online this morning at 8:25 or 8:26 am that we knew he could be home and we were hoping that through the process of his conditions of probation and him being able to provide consent through that that we could find it and potentially avoid having to do the search warrant. But obviously things have changed now. So my intention is going to be to seal off his room with evidence tape and we will leave, and we will work on writing a search warrant. When and if we are able to get that search warrant and come back, if for some reason, we find that that evidence tape has been cut or been removed from his room that would be grounds for us to arrest anybody in the household for tampering with evidence and other crimes related to impeding our investigation. So that's where we're at right now. And that's where we intend to move forward."

At that point, Duffitt told defendant's mother, "[u]nless you know what we're looking for, and we can obviously go down that road." To which defendant's mother replied, "I have no idea. But [defendant], I don't want them going through my house. If this is where we are, this is where we

are." Defendant did not respond to his mother. Duffitt then said to defendant:

> "[Defendant,] I understand that your mom instigated you to say you wanted a lawyer before any questioning. We're obviously not questioning you. But we can address that if you want to talk further or if you want to go down that road. That's fine. That's up to you. I'm not by any means making any promises, threats, any other thing that's going to be—besides you changing your mind. You can always let us know that too."

Defendant's mother then said to defendant: "If they're going to find something through a search warrant," and defendant interjected, "Please, just give me a minute."

Dale then went into the office where defendant's mother was sitting and, using his phone, showed her the email defendant had received that morning reflecting that defendant had used an "on-demand" Wi-Fi pass that morning. The following exchange occurred:

> "DALE:   So for instance, I set up his account which he gave us consent to take over *** to forward any of these emails that come in his account to myself.
>
> "DEFENDANT'S  MOTHER: Yeah, I  got  it,  I understand.
>
> "DALE:   And so the email says 'Thanks for ordering a Wi-Fi on-demand pass. Your pass was activated on 3/18/2020 at 11:25 am Eastern Standard Time,' so that would be 8:25 am here. And you can use it through the same day an hour later at any hotspot. And on this particular one it doesn't show that he used a credit card to pay because it's just going to be the one-hour free monthly pass that you can get. And that was sent to girlcave69@[    ].com. That's one of the three that he gave us consent to take over earlier. So, that's—and I've got 57 other emails like this going back to 2017."

Shortly thereafter, Johnson told defendant, "so, [defendant], we are going to be transporting you soon, so." Duffitt and Dale briefly conferred in the kitchen, and although the exchange is largely indiscernible on Dale's body camera footage, Dale testified that he and Duffitt were concerned that defendant "might have been conflicted in

wanting to talk with us further or to make any statements to us or to consent to seizure of this device in front of his mother and so we were discussing whether or not he could—may or may not feel more comfortable having this discussion or this thought process somewhere else."

Duffitt and Dale returned to the living room and Duffitt asked defendant, "[g]iven where you're at, man, would you rather be outside not in front of everybody else?" Defendant responded, "I'm going to tell you where it is."

Dale and Duffitt then went upstairs with defendant and Duffitt told defendant:

"You still have the right to remain silent. You have the right to talk to an attorney before you talk to us at all. Before you give consent for anything, okay? And we, like he explained, we'd be applying for and asking a judge for a search warrant so if you consent it's your consent alone, okay? You do not have to give consent. You do not have to do that. Do you understand that? I just want to make sure you understand you're giving consent based on consent not because there's any other promises or fear you have."

Defendant answered, "I just fear that you're going to emotionally destroy my mother by pulling our house apart again and that is what I'm basing this decision on."

Duffitt, Dale, and defendant then discussed consent further and had the following exchange:

"DEFENDANT:    I am choosing to tell you where this is to help my mother. Not for any reason for myself. Because I do not want my mother to suffer any more than she already is. I am consenting. I understand what that means.

"DUFFITT:    Consenting to show us where this device is at?

"DEFENDANT:    Yes.

"DUFFITT [to Dale]:    Any follow up?

"DALE:  No, just, again, we're just making sure because you told us 'no' before, which is fine, and so in those circumstances we have to make it blatantly clear and obvious that it's not because, you know, we're coercing you, or making you promises of any kind.

"DEFENDANT:   You are not promising me anything. I merely wish to save my mother a little bit of pain."

Defendant then directed Dale and Duffitt to the Kindle Fire, which was hidden behind some books on his bookshelf. Law enforcement did not conduct any further search of the bedroom or seek any further consent to search the bedroom.

As a result of content found on the Kindle Fire, the state charged defendant with 19 counts of sexual misconduct, including encouraging child sexual abuse and encouraging the sexual assault of an animal. Relying on Article I, section 12, defendant moved to suppress any evidence gathered by law enforcement after he had invoked his right to counsel as the product of unlawful interrogation.[3]

The trial court denied defendant's motion to suppress. It first determined that defendant unequivocally invoked his right to counsel, but that "law enforcement talking with him about the consent afterward" was "not impermissible" and was "not designed to elicit incriminating statements," but merely "advising him regarding the consent." It further found that defendant's decision to disclose the location of the Kindle Fire was made "to protect his mother" and "not have another search" of the home.

Subsequently, defendant entered a conditional guilty plea to seven counts of first-degree encouraging child sexual abuse, ORS 163.684, and one count of encouraging sexual assault of an animal, ORS 167.341. This appeal followed.

## THE APPEAL

Defendant assigns error to the trial court's denial of his motion to suppress. Defendant argues, in pertinent part, that under the totality of the circumstances, law enforcement violated his rights under Article I, section 12, "when they made statements that were likely to elicit an

---

[3] We note that, "[w]here a defendant's Article I, section 12, right to counsel has been violated, the remedy for that violation extends not only to a defendant's uncounseled responses to a detective's questions but also to the physical and testimonial evidence that is the product of that violation." *State v. Joaquin*, 307 Or App 314, 324, 476 P3d 1263 (2020).

incriminating response."[4] Specifically, as defendant sees it and as clarified at oral argument, law enforcement violated defendant's Article I, section 12, rights when they "pressured defendant to reveal the location of the Kindle."

The state responds that officers did not violate defendant's rights under Article I, section 12, because they did not interrogate defendant "by accepting defendant's decision to disclose the computer tablet after his mother urged him to do so" or when they explained "to defendant's mother that they would apply for a search warrant based on defendant's activities." As the state sees it, "none of the officers' statements to defendant's mother were statements that they should have known were reasonably likely to elicit an incriminating response from defendant."[5] The state also likens this

---

[4] Defendant also makes various arguments under the Fifth Amendment to the United States Constitution and Article I, section 11. In light of our analysis in this opinion, which concludes law enforcement violated defendant's rights under Article I, section 12, we need not address defendant's Fifth Amendment or Article I, section 11, arguments.

[5] The state also argues that "even if the officers interrogated defendant under Article I, section 12, defendant's decision to disclose the computer tablet was attenuated from the alleged illegality." Further, pointing to a statement in its response to defendant's motion to suppress in the trial court that "[w]hen looking at the totality of the circumstances, there is no evidence [defendant's] consent was anything other than an act of free will," the state argues that it sufficiently raised its attenuation theory below and, therefore, we may affirm on the basis of attenuation.

We disagree that the state adequately raised its attenuation theory below. In the trial court, the state argued that the evidence at issue did not need to be suppressed because (1) a request for consent to search is not an interrogation in violation of the right to counsel and (2) defendant's consent was voluntary. But whether officers unlawfully interrogated defendant, and whether he subsequently voluntarily told officers the location of the tablet, are different issues than whether police exploited the unlawful interrogation to obtain the disputed evidence. *See State v. Unger*, 356 Or 59, 79, 333 P3d 1009 (2014) ("Voluntary consent, while important, is not dispositive and does not relieve courts of undertaking the fact-specific exploitation analysis."). And because the state did not raise its attenuation theory below, the trial court never engaged in the necessary "fact-specific inquiry" regarding whether the state carried its burden of proof under that theory. *State v. Escudero*, 311 Or App 170, 174, 489 P3d 569 (2021) (noting "the determination of whether law enforcement exploited unlawful conduct to obtain consent involves a fact-specific inquiry into the totality of the circumstances to determine the nature of the causal connection" (internal quotation marks omitted)).

Further, we disagree with the dissent that the state's attenuation argument "meets the 'right for the wrong reason' exception as described in" *Outdoor Media Dimensions Inc. v. State of Oregon*, 221 Or 634, 659-60, 20 P3d 180 (2001). 329 Or App at 500-01 (Kamins, J., dissenting). Indeed, the state does not argue that the requirements of *Outdoor Media* are met. *State v. Carter*, 315 Or App 246, 250, 498 P3d 822 (2021) (noting that it is "the state's burden to establish that the

case to *State v. Hatfield*, 246 Or App 736, 743, 268 P3d 654 (2011), *rev den*, 352 Or 341 (2012), where, as discussed further below, we held that mere request for consent to search is not "interrogation" under Article I, section 12.

A suspect "has an Article I, section 12, right to counsel that derives from the state constitutional *Miranda* right." *State v. Swan*, 363 Or 121, 124, 420 P3d 9 (2018). The Article I, section 12, right to counsel "attaches when a suspect who is in custody or compelling circumstances invokes the right." *Id.* Once a suspect has invoked that right, law enforcement "interrogation" must cease. *State v. Shevyakov*, 311 Or App 82, 87, 489 P3d 580 (2021). "'Interrogation,' for purposes of Article I, section 12," means not just questioning, but any "police statements or conduct likely to elicit some type of incriminating response." *Id.* (some internal quotation marks omitted); *see also Rhode Island v. Innis*, 446 US 291, 301, 100 S Ct 1682, 64 L Ed 2d 297 (1980) (holding that under the Fifth Amendment to the United States Constitution "interrogation" "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect" (footnote omitted)).

More specifically, "because Article I, section 12, concerns the right not to be compelled to testify, interrogation means statements or conduct likely to elicit (1) an incriminating response that is (2) testimonial; and (3) that the prosecution later may seek to introduce at trial." *Shevyakov*, 311 Or App at 87 (internal quotation marks omitted).[6]

---

requirements for affirmance on an alternative basis are satisfied"). But, in any event, given "the fact-intensive nature of the lack of exploitation inquiry, we have frequently declined the state's invitation to affirm denial of a suppression motion on that alternative basis when the state did not argue lack of exploitation below." *State v. Aguirre-Lopez*, 291 Or App 78, 86, 419 P3d 751 (2018) (collecting cases). In this case, at the very least, affirming under the "right for the wrong reason" doctrine is not appropriate because, had the state raised its attenuation argument below, defendant might have created a different record in the trial court. *State v. Najar*, 287 Or App 98, 109-10, 401 P3d 1205 (2017) (declining to consider attenuation argument as alternative basis to affirm because "[a]t a minimum, [the defendant] might have chosen to testify about how the initial illegal seizure contributed to his ultimate consent and admission to possessing drugs").

[6]  Under Article I, section 12, "interrogation" does not include questions "normally attendant to arrest and custody." *State v. Schmidtke*, 290 Or App 880, 885,

In considering whether the conduct of law enforcement violates a defendant's Article I, section 12, rights, we have explained that a "consent to search is not an incriminating statement under Article I, section 12," and, for that reason, a request for consent to search is not "interrogation" under Article I, section 12. *Hatfield,* 246 Or App at 743-44.[7]

Thus, in *Hatfield*, we concluded that law enforcement did not violate the defendant's Article I, section 12, right to counsel when, after the defendant invoked his right to counsel, law enforcement repeatedly requested the defendant's consent to search his residence and informed him that, if he did not consent, they would apply for a search warrant. *Id.* at 73-40, 745. The defendant in *Hatfield* ultimately consented to the search of his residence with the caveat that he be permitted "to sit on his couch with his handcuffs removed, put away his dogs, and smoke a cigarette," and that officers not "ransack the house." *Id.* at 739.

We have also explained that, in some cases, confronting "a detainee with the evidence against [them] can constitute interrogation," although it does not always. *State v. Schmidtke*, 290 Or App 880, 887, 417 P3d 563 (2018). The "manner in which the defendant is confronted with that evidence affects the analysis." *Id.* (internal quotation marks omitted).

Both *State v. Bradbury*, 80 Or App 613, 723 P2d 1051, *rev den*, 302 Or 342 (1986), and *State v. Guayante*, 63 Or App 212, 663 P2d 784, *rev den*, 295 Or 541 (1983), are illustrative of the analysis we undertake in determining whether confronting a detainee with the evidence against them constitutes interrogation:

---

417 P3d 563 (2018). We do not understand the state to contend that the conduct of law enforcement in this case constitutes questions normally attendant to arrest and custody.

[7] We pause to note that that rule from *Hatfield* is subject to an important caveat: It applies only where the law precludes the use of a person's refusal to consent to search at trial. *Shevyakov*, 311 Or App at 90 ("[W]e conclude that the rule we have discerned—that asking for consent to search *** constitutes impermissible interrogation unless the law precludes the use of a person's refusal against the person at trial—is the one demanded by the dictates of current precedent.").

As explained below, 329 Or App at 495, in our view, the officers' conduct in this case was likely to elicit the incriminating response that it did from defendant. It was not a mere request for consent to search.

"[I]n *Guayante*, we held that an officer interrogated the defendant when the officer, without prompting from the defendant, made a statement using evidence to connect the defendant to the crime. 63 Or App at 215. In that case, we held that the officer interrogated the defendant when, while in the defendant's house, he pointed to evidence that he found in the defendant's house and stated, 'Look, we already know you did it. Here is the stuff you took from him.' *Id.* at 217-18. In contrast, in *Bradbury*, we held that an officer did not interrogate the defendant when, while in a police station and in response to an unprompted request from the defendant, the officer pointed to items that the defendant was accused of stealing when telling the defendant that he was being charged with burglary without also indicating how that evidence tied the defendant to the crime. 80 Or App at 615-17."

*Schmidtke*, 290 Or App at 887. A further datapoint for such analysis is our decision in *Schmidtke*, where we held that when an officer told the defendant that the defendant had been identified in a surveillance video in the area of a crime moving property into a storage unit, that constituted interrogation. *Id.* at 888.

Turning back to the instant case, we conclude that the conduct of law enforcement was conduct likely to elicit some type of incriminating response from defendant (*i.e.*, the location where defendant had hidden the Kindle Fire) and, therefore, constituted unlawful interrogation of defendant under Article I, section 12.

Here, defendant was mere feet from Dale and Duffitt when Dale provided a detailed description of how law enforcement had determined that defendant was using the internet, notwithstanding the conditions of his probation (albeit a description "mostly directed" to defendant's mother).[8] Dale indicated that law enforcement had already obtained evidence from a third party, Comcast, showing internet access in the cul-de-sac tied to defendant's accounts; that law enforcement had evidence of improper internet

---

[8] To the extent the state argues that defendant himself was already aware of the information that Dale conveyed to defendant's mother and defendant while defendant was handcuffed on the stairs because most of the details of that explanation had been conveyed to him by law enforcement, we reject that argument. It is not supported by the record.

usage dating back to 2017; that law enforcement was aware defendant's access was pervasive—that is, that through Wi-Fi passes defendant was able to access the internet for "49.37%" of 2019 and that law enforcement had taken the time to perform that calculation; that law enforcement knew the specific type of device defendant was using to access the internet, a Kindle Fire; and that law enforcement knew the month he had connected that Kindle Fire to his account.

Moreover, even after defendant interjected that he needed "a minute," Dale approached defendant's mother and continued to present incriminating evidence against defendant with defendant in the immediate vicinity—*viz.*, showing defendant's mother an email that defendant received at his "girlcave69" email account reflecting that he had accessed the internet that very morning. And Duffitt told defendant and his mother that if law enforcement had to serve the search warrant that they were applying for, they would "hit[ ] the door down" (notwithstanding that they were taking defendant—the suspect—into custody and intended to cover defendant's door with evidence tape to make sure nothing in defendant's room was tampered with).

That pressure Dale and Duffitt applied on defendant came shortly after Johnson, with Dale and defendant's mother present, had repeatedly asked defendant to disclose the location of the Kindle Fire—namely, when Johnson stated to defendant while defendant was in his room:

- "Do you want to tell me where the device is?";

- "So are their other devices? Where? Come on.";

- "So this one [the PlayStation] is different you've had before, alright? So other devices.";

- "[Defendant,] do you want to tell me where your other device is?"; and

- "[Defendant,] that's why I asked you if you wanted to tell me where the other device is."

Johnson also indicated to defendant's mother, in front of defendant, that there was something "specific [defendant could] hand over"—*viz.*, the "electronic device that accesses the internet."

It is against that backdrop, with that understanding of what law enforcement was looking for and what would satisfy them, that we think the pressure law enforcement put on defendant through its presentation of the evidence against defendant was likely to elicit the incriminating response that it did from defendant—*viz.*, the location where he had hidden the Kindle Fire.[9]

In reaching our conclusion, we are cognizant that disclosing the location of the Kindle Fire is not the only response that the conduct of law enforcement might have elicited from defendant in this case. That is, in response to Dale presenting the evidence that they had gathered against defendant and saying that they were going to try to obtain a search warrant, and to Duffitt saying that if they did obtain a search warrant they would "hit[ ] the door down," defendant could have, for example, responded by consenting to a search of his room. That response, per *Hatfield*, 246 Or App at 744, would not have been incriminatory under Article I, section 12. But this case is not like *Hatfield* because in the face of defendant's refusal to consent to a search, law enforcement did not merely continue to request consent to search and inform defendant that they would apply for a search warrant if he did not consent. Instead, after repeatedly asking defendant for the location of the device they were looking for, law enforcement presented the evidence they had collected against defendant. In essence, law enforcement told defendant what they wanted him to disclose—the location of the Kindle Fire—and, as in *Guayante*, said, "Look, we already know you did it. Here is the [evidence]." 63 Or App at 217.

The state notes that accessing the internet is, in itself, not a crime, and no law enforcement revealed evidence that "investigators knew what defendant was viewing." But

---

[9] We do not understand the state to argue that defendant's disclosure of the location of the Kindle Fire was not an incriminating response, but we pause to note that our conclusion that it was an incriminating response is in accord with courts in other jurisdictions that have considered similar issues. *See, e.g., State v. Wethered*, 110 Wash 2d 466, 471, 755 P2d 797, 800 (1988) ("Granting permission to search is consistent with innocence, whereas producing contraband from a hiding place is essentially an admission of guilt."); *United States v. Green*, 272 F3d 748, 750 (5th Cir 2001) (holding that the defendant's compliance with an investigator's request that the defendant "open the combination lock of a gun safe and locate other stored guns in his home" was "testimonial evidence obtained in violation of [the defendant's] Fifth Amendment right to counsel").

in the context of this case, we are not persuaded that that matters. Defendant would have understood the nature of Dale's investigation; the import of the device Dale sought; and how the evidence connected that device to him.

Additionally, although Dale's description of the evidence against defendant was "mostly directed" toward defendant's mother, not defendant, the fact that the conduct of law enforcement is "mostly directed" toward a third party, not the suspect, does not preclude such conduct from constituting unlawful interrogation when the suspect is present and can hear the conversation. *Cf., e.g.*, *Innis*, 446 US at 302-03 (considering whether officers' conversation with each other in front of suspect constituted "interrogation" under the Fifth Amendment to the United States Constitution, but concluding that it did not, where the conversation was not "a lengthy harangue"); *see also State v. Ward*, 367 Or 188, 197 n 7, 475 P3d 420 (2020) ("With respect to issues arising under Article I, section 12, we have sometimes looked for guidance to Fifth Amendment decisions of the United States Supreme Court."). As noted, the question in this case is whether law enforcement's "statements or conduct" was "likely to elicit some type of incriminating response" from defendant. *Shevyakov*, 311 Or App at 87 (internal quotation marks omitted). Here, we conclude that it was.

In reaching that conclusion, we are also cognizant that defendant ultimately told law enforcement the location of the Kindle Fire after his mother said to defendant, "I don't want them going through my house" and "if they are going to find something through a search warrant." Further, the trial court found that defendant's decision to disclose the location of the Kindle Fire was made "to protect his mother" and "not have another search" of her home. Courts applying federal law "have held the dictates of *Miranda* *** [to be] inapplicable to questioning of suspects in custody by private citizens"—for example, a suspect's mother—when that private citizen is "acting on their own initiative." *See, e.g.*, *Graham v. United States*, 950 A2d 717, 732-33 (DC 2008) (collecting cases); *Whitehead v. Cowan*, 263 F3d 708, 719 (7th Cir 2001) ("A police awareness that suspects sometimes confess after they speak with close friends or family does not

mean this court should adopt a rule that encourages police to bar friends or family members from seeing a suspect."). Consequently, here, if it were the case that defendant's mother, in her capacity as a private citizen, separately, and without police involvement, encouraged defendant to disclose the location of the Kindle Fire and defendant thereafter did so, that set of facts might point toward a different result. But that set of facts is not the set of facts in this case.

In this case, defendant's mother's statements to defendant, "I don't want them going through my house" and "if they are going to find something through a search warrant," occurred during the course of Duffitt's and Dale's interactions with defendant and his mother. Even *after* defendant's mother told defendant, "if they are going to find something through a search," and defendant said, "please, just give me a minute," Dale continued to present defendant's mother, with defendant in the immediate vicinity, with evidence of defendant's internet usage, and in particular, his internet usage that very morning. Dale went as far as to use his phone to show defendant's mother, in defendant's presence, the evidence of defendant's internet usage. Given that series of events, we think defendant's decision to disclose the location of the Kindle Fire—when he stated, "I'm going to tell you where it is"—cannot be meaningfully disconnected from the conduct of law enforcement.[10]

In sum, the conduct of law enforcement in this case was "likely to elicit an incriminating response" from defendant and occurred after defendant invoked his right

---

[10] As recently noted by the Supreme Court, the protection "against police interrogation of a defendant in the absence of counsel—and the exclusion of evidence derived from such an interrogation—can apply not only when the interrogation is conducted directly by the police, but also when the questioning is by a private citizen acting as an agent of the police." *State v. Benton*, 371 Or 311, 319-20, 534 P3d 724 (2023) (so noting with respect to the Article I, section 11, protection against police interrogation of a defendant in the absence of counsel).

In this case, we do not understand defendant's mother to have been acting as an "agent of the police" as that phrase is used in *Benton* when she encouraged defendant to disclose the location of the tablet, nor does defendant argue she was acting as an "agent of the police."

But, in our view, *in toto*, the conduct of law enforcement *vis-à-vis* defendant and his mother (in defendant's presence) was "likely to elicit an incriminating response" from defendant and a violation of defendant's rights under Article I, section 12.

to counsel under Article I, section 12. Therefore, we reverse defendant's convictions and remand for further proceedings.

Reversed and remanded.

**KAMINS, J.,** dissenting.

Defendant was caught red-handed using the internet in violation of his probation. He committed another probation violation when he declined to give his probation officer consent to search for the device that he used to access the internet. As a result, his probation officer decided to take defendant into custody and did so with the assistance of the police, who were planning to execute a search warrant at his mother's house while defendant remained in jail. Defendant was out of options to avoid that outcome, but the police offered him one. Because police were both respectful of defendant's autonomy and careful to ensure that his choice to grant consent to search was knowing and voluntary, I respectfully dissent.

Police had evidence that defendant (who was on probation and prohibited from using the internet) accessed the internet from a specific Kindle device in his mother's house. When police went to defendant's house, he invoked his right to counsel, meaning that the police could not interrogate him but could, in this case, seek consent to search. The officers told defendant about the specific device they were seeking and asked for consent to search for it, or for defendant to turn it over. Alternatively, they would obtain a search warrant for defendant's mother's house (a warrant that an officer was already preparing as part of a related investigation). The line between interrogation and seeking consent to search can be fuzzy. But, here, the police officers explained their lawful request to defendant, they told him more than once that he was not required to give his consent, and they also explained their next steps to him should he decline to consent. And defendant's expressed rationale for his decision to consent—to save his mother "a little bit of pain"—was itself evidence that the decision was voluntary. In my view, there was no violation, but, even if there was, it was attenuated by the police's subsequent actions.

The majority carefully analyzes the police actions in reaching the conclusion that the police's request that defendant give them the device strayed into improper interrogation. They draw a finer line than I would. However, because any possible violation of defendant's rights was minor, it was attenuated by police's subsequent actions. Accordingly, I would affirm the trial court's decision not to suppress the Kindle device.

At the outset, I disagree with the majority that the record does not allow us to address the question of attenuation. 329 Or App at 490 n 5. When affirming on a basis not addressed by the trial court, we first ask whether the party raised the argument below. If so, and "the argument is properly presented again on appeal and raises a question of law, we may simply resolve it[.]" *Sherertz v. Brownstein Rask*, 314 Or App 331, 341, 498 P3d 850 (2021), *rev den*, 369 Or 338 (2022). As explained below, despite the state not explicitly using the word "attenuation," its arguments centered on the theory that police ensured that defendant's provision of the Kindle[1] was not caused by the officers' earlier conversations with defendant, rendering his consent to turn over the device voluntary. Even if, however, the state had not raised the theory below, we may address it under the right-for-the-wrong-reason principles set forth in *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001).

First, the state did raise attenuation. As the majority recognizes, the state argued in its written response to the motion to suppress that defendant's consent was "an act of free will." The state's brief further contended that, just before defendant turned over the device, the police "reviewed his *Miranda* warnings with [him] again in his bedroom, told him he did not have to consent and reiterated they could apply for a warrant." In its opening argument, the state picked up on that theme, observing that defendant understood consent, had been through this process before, and "was reminded of his *Miranda* rights, he was reminded of his right to consent in that instance."

---

[1] The state never sought to introduce any of defendant's statements or the testimonial act of locating and producing the Kindle.

In closing, the prosecutor focused on the circum-
stances that occurred *after* the alleged pressure from the
police, observing that defendant is "given several minutes,
okay. He's taking that time. The officers then give him the
ability to go outside and be away from his mother. That's
when he decides to consent." Next the state argued that
even after defendant's decision to consent,

> "the officers don't just railroad over him and say 'Where's
> the device? Tell us where it is.' No. They're conscientious,
> they're concerned. They're saying 'Here's your *Miranda*
> rights. Do you understand what those mean? Do you
> understand what consent means? Do you understand you
> don't have to do this? Do you understand we're not making
> threats and promises?'"

In other words, the prosecutor argued that *after* the conduct
that the majority concludes amounted to a *Miranda* viola-
tion, officers took steps to ensure that defendant willingly
consented—a classic attenuation argument.

The state raised the attenuation argument in brief-
ing and in the hearing before the trial court. Because the
state's argument implicates the question of law raised below
and on appeal, it is appropriate for us to consider it. *See
Boyd v. Legacy Health*, 318 Or App 87, 97, 507 P3d 715 (2022)
(holding that the defendant's arguments were properly
before this court where the arguments were raised in the
defendant's briefing to the trial court and implicated ques-
tions of law); *Sherertz*, 314 Or App at 341 (holding that this
court may resolve an alternative argument where the argu-
ment "was made in the trial court[,]" "is properly presented
again on appeal[,] and raises a question of law").

Even if the attenuation argument had not been
raised below, however, it meets the "right for the wrong rea-
son" exception as described in *Outdoor Media Dimensions*,
331 Or at 659-60. Under those principles,

> "[f]or us to affirm a trial court's ruling on a basis other
> than that on which the court relied, (1) 'the facts of record
> [must] be sufficient to support the alternative basis for
> affirmance'; (2) 'the trial court's ruling [must] be consis-
> tent with the view of the evidence under the alternative
> basis for affirmance'; and (3) 'the record [must] materially

> be the same one that would have been developed had the prevailing party raised the alternative basis for affirmance below.'"

*State v. Booth*, 272 Or App 192, 199, 355 P3d 181 (2015), quoting *Outdoor Media*, 331 Or at 659-60. As explained below, the facts of the record are sufficient to support the alternative basis for affirmance. That basis is itself consistent with the trial court's decision that defendant's consent was voluntary: "I believe that his consent was voluntary. I think indeed there were—they did offer him several opportunities, explaining to him, making sure that it was a voluntary consent and that he understood his rights and he affirmatively stated he did and that he was consenting." And the record is materially the same one that would have been developed had the state used the word "attenuation"—the attenuation argument relies on the officers' colloquy about the meaning of consent, which is included in the record as a video recording, was discussed by the parties at the trial level, and was thoroughly evaluated by the trial court before it made its ruling. *Cf State v. Escudero*, 311 Or App 170, 174, 489 P3d 569 (2021) ("Because the attenuation argument is raised for the first time on appeal, the trial court never engaged in the fact-specific inquiry on whether the state carried its burden of proving that [the] defendant's consent was independent of, or only tenuously related to, the unlawful police conduct. Accordingly, because the record may have developed differently with respect to the exploitation analysis, we decline to consider the state's alternative basis for affirmance.").

Turning to the substance of the issue, "when a *Miranda* violation has occurred, a defendant's voluntary consent can attenuate the prior violation if the consent was either not affected by or was only tenuously connected to a prior illegality." *State v. Williams*, 320 Or App 705, 715, 514 P3d 501 (2022) (internal quotation marks omitted). "To determine if a defendant's voluntary consent was 'sufficient to break the causal chain,' we consider *** : the nature of the violation, the character of the defendant's consent, and the causal connection between the violation and the defendant's consent." *Id*. (citations omitted).

First, considering whether the violation was flagrant, it was not. Although officers were precluded from interrogating defendant, there is no question that they were allowed to seek consent to search after defendant invoked his right to counsel. *See State v. Hatfield*, 246 Or App 736, 744, 268 P3d 654 (2011) (Where the law provides that a criminal defendant's refusal to consent cannot be admitted for the purpose of incriminating them, such as here, "a request for consent to search does not constitute interrogation under [the state or federal constitution]."); *see also State v. Shevyakov*, 311 Or App 82, 90, 489 P3d 580 (2021). There is also no question that officers could outline the next steps of the process, including stating that they were planning to seek a search warrant and identifying the evidence they would use in support of that effort. *See Hatfield*, 246 Or App at 746 (finding it permissible that police informed defendant that "they would apply for a search warrant if necessary"); *State v. Schmidtke*, 290 Or App 880, 886, 417 P3d 563 (2018) ("The officer's statement merely informing [the] defendant of the criminal activity for which the officer was investigating and detaining [the] defendant was not designed to elicit an incriminatory response or a statement that, by its very nature, evidenced an investigatory purpose."). The majority concludes that the police here crossed that fine line, but a fine line—not a flagrant violation—it is. *See State v. Delong*, 357 Or 365, 378, 350 P3d 433 (2015) (explaining that an Article I, section 12, violation "can hardly be characterized as egregious" where it did not involve "interrogation techniques designed to break down a suspect's will" (citing *Miranda v. Arizona*, 384 US 436, 448-55, 86 S Ct 1602, 16 L Ed 2d 694 (1966))).

Next, in weighing the character of the defendant's consent, the officers' statements thoroughly and effectively ensured that defendant understood consent and communicated that the choice was his. Officers engaged in the following conversation with defendant, well after the purported interrogation occurred:

"LIEUTENANT DUFFIT:   I just want to make sure. I wasn't here initially. When you were read your Miranda warning. What does the Miranda warning mean to you, or what's it mean to you?

"DEFENDANT:   I understand that I have a right to remain silent. I have a right to an attorney. But you're getting a search warrant, and you're going to tear my house apart so it doesn't really matter if I remain silent or not.

"LIEUTENANT DUFFIT:   Well, it does. You still have the right to remain silent. You have the right to talk to an attorney before you talk to us at all. Before you give consent for anything, okay? And, we, like he explained, we'd be applying for and asking a judge for a search warrant so if you consent it's your consent alone, okay? You do not have to give consent. You do not have to do that. Do you understand that? I just want to make sure you understand you're giving consent based on consent not because there's any other promises or fear you have.

"DEFENDANT:   I just fear that you're going to emotionally destroy my mother by pulling our house apart again and that is what I'm basing this decision on.

"LIEUTENANT DUFFIT:   Okay, what does consent mean to you? Do you understand what that means?

"DEFENDANT:  Yes, I understand what consent means.

"LIEUTENANT DUFFIT:   No, I think you're a smart guy. And I'm not trying to offend you at all. But I want to make sure that you know what that means.

"DEFENDANT:   I am choosing to tell you where this is to help my mother. Not for any reason for myself. Because I do not want my mother to suffer any more than she already is. I am consenting. I understand what that means.

"LIEUTENANT DUFFIT:  Consenting to show us where this device is at?

"DEFENDANT:   Yes.

"LIEUTENANT DUFFIT [to Detective Dale]:   Any follow up?

"DETECTIVE DALE:   No, just, again, we're just making sure because you told us 'no' before, which is fine, and so in those circumstances we have to make it blatantly clear and obvious that it's not because, you know, we're coercing you, or making you promises of any kind.

> "DEFENDANT:    You are not promising me anything. I merely wish to save my mother a little bit of pain."

The officers informed defendant of the meaning of consent and confirmed that defendant understood and that he knew he did not need to consent. While defendant's invitation to search was not unprompted, *see Delong*, 357 Or at 379-80, the character of defendant's consent to produce the Kindle was knowing and voluntary.

Finally, we consider the causal connection between the violation and defendant's consent. Here, the officers' conversation with defendant during which they clearly informed him of his rights served as a significant intervening event that attenuated any prior illegality. *See State v. Unger*, 356 Or 59, n 12, 333 P3d 1009 (2014) (holding that police admonitions or warnings, "although not required, may be helpful when the state seeks to show that it did not exploit any police misconduct to obtain consent"); *State v. Lorenzo*, 356 Or 134, 144, 335 P3d 821 (2014) ("Such warnings [that an individual need not consent] would make it easier for reviewing courts to determine that, notwithstanding any prior illegality, the individual knew that he or she had a constitutional right to refuse consent—and that, if the individual gave consent, it was voluntary and not the product of exploitation."). Moreover, the allegedly unlawful interrogation in this case did not yield the incriminating information of the location of the Kindle. To the extent that there was any doubt as to whether that consent was causally connected to the majority's description of the violation—improperly pressuring defendant to provide incriminating information by "presenting the evidence that they had gathered against defendant"—defendant himself articulately explained that his consent to turn over the device was entirely due to his desire for officers to avoid obtaining a search warrant: "I just fear that you're going to emotionally destroy my mother by pulling our house apart again and that is what I'm basing this decision on." 329 Or App at 495. As defendant explained, the pressure associated with officers describing the evidence against defendant did not cause him to crack and provide incriminating information; he merely hoped to save his mother "a little bit of pain." In addition to saying that he understood his right not to

consent, defendant's explanatory response given in his own words was itself evidence that he had made a rational decision, voluntarily and knowingly, under the circumstances then present. Defendant assessed his options and made an informed decision based on criteria wholly unrelated to his own criminal exposure.

Because I believe that defendant's consent was knowing and voluntary and that the taint, if any, was attenuated, I would affirm the trial court's decision denying defendant's motion to suppress.